**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

|  |  |  |
|---|---|---|
| NANOCO TECHNOLOGIES LTD., <br><br>     Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO., LTD., and SAMSUNG ELECTRONICS AMERICA, INC. <br><br>     Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 2:20-cv-00038-JRG <br><br> **JURY TRIAL DEMANDED** |

**PLAINTIFF NANOCO TECHNOLOGIES LTD.'S**
**INITIAL CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................. 1

II.  TECHNOLOGY BACKGROUND AND THE NANOCO PATENTS ............................. 1

    A.  Level of Ordinary Skill ................................................................................ 5

III.  LEGAL PRINCIPALS OF CLAIM CONSTRUCTION.................................................. 6

IV.  CLAIM CONSTRUCTION.......................................................................................... 6

    A.  "molecular cluster compound" ('423, '365, '828, and '557 patents) ........................... 6

        1.  The term "molecular cluster compound" should be construed as the patentee defined it in each of the patents ......................................................... 7

        2.  The term "molecular cluster compound" is not indefinite.............................. 10

    B.  "wherein said[/the] conversion is[/being] effected in the presence of a[/the] molecular cluster compound" ('423, '365, '828, and '557 patents) ........................ 13

    C.  "first semiconductor material" ('557 patent) ................................................. 16

    D.  "emulsion" ('068 patent)........................................................................... 18

    E.  "polymer" ('068 patent)............................................................................ 22

V.  CONCLUSION....................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advance Rumley Co. v. John Lauson Mfg. Co.*,
275 F. 249 (7th Cir. 1921) ...................................................................................... 7

*Arbmetrics, LLC v. Dexcom, Inc.*,
Case No.: 18-CV-134 JLS (KSC), 2019 U.S. Dist. LEXIS 222306 (S.D. Cal.
Dec. 30, 2019)....................................................................................................... 18

*Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.*,
262 F.3d 1258 (Fed. Cir. 2001).............................................................................. 25

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
783 F.3d 1374 (Fed. Cir. 2015)............................................................................... 10

*Chemtall, Inc. v. United States*,
878 F.3d 1012 (Fed. Cir. 2017)................................................................................ 8

*Ericsson, Inc. v. D-Link Sys.*,
773 F.3d 1201 (Fed. Cir. 2014)............................................................................... 13

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014)............................................................................... 10

*Kaneka v. Xiamen Kingdomway Group*,
790 F.3d 1298 (Fed. Cir. 2015)............................................................................... 24

*Liebel-Flarsheim Company v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004)................................................................................. 15

*Mars, Inc. v. TruRX LLC*,
No. 6:13-CV-526, 2015 U.S. Dist. LEXIS 187875 ............................................... 17

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
579 F.3d 1363 (Fed. Cir. 2009)................................................................................ 7

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
474 F.3d 1323 (Fed. Cir. 2007)........................................................................... 22, 24

*Merck & Co. v. Teva Pharms. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005)............................................................................... 21

*Mobilemedia Ideas LLC v. HTC Corp.*,
No. 2:10-cv-112 (E.D. Tex. Dec. 12, 2012) ............................................................ 6

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014) ................................................................................................ 12

*Oatey Co. v. IPS Corp.*,
  514 F.3d 1271 (Fed. Cir. 2008) ............................................................................. 24

*One-E-Way, Inc. v. Int'l Trade Comm'n*,
  859 F.3d 1059 (Fed. Cir. 2017) ....................................................................... 10, 12

*Optis Wireless Tech., LLC v. Huawei Device Co.*,
  No. 2:17-cv-123-JRG-RSP, 2018 U.S. Dist. LEXIS 7711 (E.D. Tex. Jan. 18,
  2018) ...................................................................................................................... 16

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ............................................... 6, 9, 15, 18

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
  378 F.3d 1396 (Fed. Cir. 2004) ............................................................................. 21

*SEVEN Networks, LLC v. Apple Inc.*,
  No. 2:19-CV-115-JRG 2020 U.S. Dist. LEXIS 55476 (E.D. Tex. Mar. 31, 2020) .................. 8

*Sinorgchem Co. v. ITC*,
  511 F.3d 1132 (Fed. Cir. 2007) ............................................................................... 7

*U.S. Surgical Corp. v. Ethicon, Inc.*,
  103 F.3d 1554 (Fed. Cir. 1997) ............................................................................. 21

*Uniloc USA, Inc. v. Autodesk, Inc.*,
  No. 2:15-cv-1187-JRG-RSP, 2016 U.S. Dist. LEXIS 87921 (E.D. Tex. July 7,
  2016) ........................................................................................................................ 9

*US Foam, Inc. v. On Site Gas Sys.*,
  735 F. Supp. 2d 535 (E.D. Tex. 2010) .................................................................... 9

*Van Wersch v. Dep't of Health & Human Servs.*,
  197 F.3d 1144 (Fed. Cir. 1999) ............................................................................. 11

*Vitronics Corp. v. Conceptronic*,
  90 F.3d 1576 (Fed. Cir. 1996) ...................................................................... 8, 11, 25

*Wasica Fin. GmbH v. Cont'l Auto Sys., Inc.*,
  853 F.3d 1272 (Fed. Cir. 2017) ............................................................................. 11

**Statutes**

35 U.S.C. § 112 ¶ 2 ................................................................................................... 10

Plaintiff Nanoco Technologies Ltd. ("Nanoco") submits this Initial Claim Construction Brief for U.S. Patent Nos. 7,588,828 ("the '828 patent") (Ex 1), 7,803,423 ("the '423 patent") (Ex. 2), 7,867,557 ("the '557 patent") (Ex. 3), 8,524,365 ("the '365 patent") (Ex. 4) and 9,680,068 ("the '068 patent") (Ex. 5).

## I.    INTRODUCTION

The parties' proposals reflect fundamentally different approaches to claim construction. Nanoco construes terms in accordance with their plain meaning unless there is clear evidence of a special definition or usage. In contrast, defendants Samsung Electronics Co., Ltd and Samsung Electronics America, Inc. (collectively, "Samsung") limit claims to specific embodiments when no special definition or usage exists, and when special definitions do exist, Samsung ignores them and resorts to extrinsic evidence. In accordance with the controlling case law, the Court should adopt Nanoco's proposed constructions, and reject those proposed by Samsung.

## II.    TECHNOLOGY BACKGROUND AND THE NANOCO PATENTS

This case is about LED display devices that use quantum dots to enhance color quality. Quantum dots are man-made semiconductor nanoparticles that can emit light at very particular wavelengths. They are tiny, ranging in size from 2-100 nanometers (nm), and it is their size that dictates the wavelength, and thus the color, of light being emitted—moving across the traditional ROY G BIV spectrum as the dots grow smaller. '423 patent at 1:11-15.



To achieve color precision, it is vital that all the quantum dots in a particular batch are sufficiently uniform in size ("monodisperse quantum dots"). Monodisperse quantum dots are useful in televisions because of their fine-tunable color generating properties. *Id*. at 1:15-17. When such quantum dots are

added to a film that sits in front of a television's backlight, they reveal a wider and more saturated range of colors than would otherwise be possible. Nanoco, an early pioneer in the manufacture of quantum dots, developed ways to make large quantities of monodisperse quantum dots (the '828, '557, '423, and '365 patents (collectively the "quantum dot patents"), and developed ways to integrate monodisperse quantum dots in films for use in displays (the '068 patent (the "film patent")).

At the time of the invention, the most studied quantum dot material was cadmium selenide ("CdSe"). Persons of skill in the art could precisely control the size of CdSe quantum dots, and thus fine-tune the color they emit. '423 Patent at 1:30-33. These CdSe quantum dots involved ions from columns 12 and 16 of the periodic table (also known as group II-VI elements).



But cadmium is incredibly toxic, and it was thus banned from use in consumer electronics in many countries. There became a need to create commercial amounts of cadmium-free quantum dots that could be fine-tuned into specific uniform sizes. Nanoco, in particular, focused on quantum dots made

from the less toxic elements from columns 13 and 15 of the period table (group III-V elements), such as indium phosphide ("InP"). '423 patent at 8:4-9. Group III-V quantum dots, however, were more difficult and time consuming to prepare using methods known in the art. '423 patent at 3:56-60.

Prior to Nanoco, quantum dots using these materials could not be made in commercial quantities with the necessary size precision. Previous methods of making Group III-V quantum required taking a solution of precursors (e.g., chemicals that contribute the indium and/or the phosphorus ions to an InP quantum dot core) and rapidly injecting them into a hot solvent. *Id*. This "hot injection" method worked well enough for small scale productions, where one solution could be added rapidly to another while keeping the same temperature throughout the reaction. *Id*. However, it did not work for larger scale productions because large volumes of solutions that are rapidly injected into one another create a temperature differential throughout the solution. *Id*. This temperature differential results in quantum dots of many different sizes. *Id*. As discussed above, this was a problem in the art. A large size distribution defeats the purpose of quantum dots by eliminating the ability to fine tune their optical properties which directly correlate with their size. *Id*. Nanoco's methods of making monodisperse quantum dots also solved this problem (among others) and allowed for the large-scale synthesis of cadmium-free Group III-V quantum dots of uniform size.

Nanoco's asserted quantum dot patents describe methods of producing quantum dots by converting multiple precursors into a quantum dot core. The first precursor species contains a first ion (such as indium), and a separate second precursor species contains a second ion (such as phosphorus), with both precursors providing an ion to be incorporated into the growing quantum dot core (e.g., InP). '423 patent at 4:36-43. An important feature of the invention is that conversion of these precursors species into the quantum dot core takes place in the presence of a ***molecular cluster compound***. *Id*. at 4:57-61. A method of the invention is depicted in Figure 3 of the '828 patent, which shows the creation of an InP quantum dot with one precursor 320 contributing a Group III atom

(indium) to the quantum dot core, and a second precursor 330 contributing a Group V atom (phosphorus) to the core, both in the presence of a zinc-based molecular cluster compound 310.

FIG. 3

This method ensures a monodisperse (uniform size) population of quantum dots.

Even with monodisperse quantum dots, there can be other problems that lower quality. The quantum dot's final form may have highly reactive "dangling bonds" on the surface, causing the quantum dots to clump together. This problem is referred to as "particle agglomeration." *See* '423 patent at 2:32-35. Particle agglomeration can lower quantum dot efficiency. *Id*. at 6:54-59. One way the patents overcome this problem is by growing one or more shells around the quantum dot core to form a "core-shell" or "core-multi-shell" nanoparticle. *Id*. at 7:1-4. For example, Figures 1A – 1C of the '828 patent show an InP core quantum dot with ZnS and ZnSe shells.



Agglomeration is also a problem when incorporating quantum dots into the films used in televisions and other displays. This is one of the problems addressed by Nanoco's '068 film patent. *See* '068 patent at 3:45-57. The '068 patent solved this problem by taking a first polymerizable hydrophobic (tending to repel water) liquid solution containing the quantum dots, and mixing it with a second polymerizable hydrophilic (tending to dissolve in water) solution to form an emulsion in which the quantum dots are suspended throughout the solution, which is then "cured" into the final film product. '068 patent at 8:54-60.

## A.    Level of Ordinary Skill

A person of ordinary skill in the art ("POSITA") in the area of nanotechnology or nanoparticle engineering at the time of the '423, '828, '557, and '365 patents would have had at least a master's degree in chemistry or a similar science and at least two years of work experience relating to nanotechnology or nanoparticle engineering, or a bachelor's degree in chemistry or a similar science and at least four years of work experience relating to nanotechnology or nanoparticle engineering. Declaration of Dr. Brandi Cossairt ("Cossairt Decl.") (Ex. 6), ¶ 44.

## III.    LEGAL PRINCIPALS OF CLAIM CONSTRUCTION

This Court is very familiar with the general tenets of claim construction, which we do not repeat here. *See Mobilemedia Ideas LLC v. HTC Corp.,* No. 2:10-cv-112, at 7-13 (E.D. Tex. Dec. 12, 2012); *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005) (en banc). Specific relevant principals of claim construction will be identified where appropriate below.

## IV.    CLAIM CONSTRUCTION

### A.    "molecular cluster compound" ('423, '365, '828, and '557 patents)

| Nanoco's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| **In the '423 and '365 patents:** "clusters of 3 or more metal or non-metal atoms and their associated ligands of sufficiently well-defined chemical structure such that all molecules of the cluster compound possess the same relative molecular mass." **In the '828 and '557 patents**: "clusters of three or more metal atoms and their associated ligands of sufficiently well-defined chemical structure such that all molecules of the cluster compound possess approximately the same relative molecular formula." | Indefinite. To the extent the term is not indefinite, it means "clusters of 3 or more metal atoms and their associated ligands of sufficiently well-defined chemical structure such that all molecules of the cluster compound possess the same relative molecular mass, where ligand means an atom or group bound to a central atom of a complex" |

The term "molecular cluster compound" appears in all asserted claims of the '423, '365, '828, and '557 patents, and is described as being an "important feature of the invention." '423 patent at 4:57-61; '365 patent at 5:5-8. Because of this importance, the patentee chose to expressly define the term in several patents to ensure its clarity. The '423 and '365 patent specifications state:

> 'Molecular cluster' is a term which is widely understood in the relevant technical field but for the sake of clarity should be understood herein to relate to clusters of 3 or more metal or nonmetal atoms and their associated ligands of sufficiently well defined chemical structure such that all molecules of the cluster compound possess the same relative molecular mass. Thus the

> molecular clusters are identical to one another in the same way that one H2O molecule is identical to another H2O molecule

'423 patent at 5:3-12; '365 patent at 5:19-28. In the '828 patent, the specification provides a slightly different definition of the term by limiting it to three or more ***metal*** atoms and their associated ligands, instead of 3 or more ***metal or nonmetal*** atoms and their associated ligands. Specifically, the '828 patent specification states:

> "Molecular cluster" is a term which is widely understood in the relevant technical field, but for the sake of clarity should be understood herein to relate to clusters of three or more metal atoms and their associated ligands of sufficiently well-defined chemical structure such that all molecules of the cluster compound possess approximately the same relative molecular formula. (When the molecules possess the same relative molecular formula, the molecular clusters are identical to one another in the same way that one H2O molecule is identical to another H2O molecule.)

'828 patent at 3:29-37.

### 1.    The term "molecular cluster compound" should be construed as the patentee defined it in each of the patents

Nanoco's constructions of the term "molecular cluster compound" are correct because they adopt the patentee's express definitions. "When a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) (en banc)). This has been black letter law for well over a century. *See, e.g., Advance Rumley Co. v. John Lauson Mfg. Co.*, 275 F. 249, 251 (7th Cir. 1921) ("This court has frequently and consistently recognized the patentee's right to be his own lexicographer, and in the present suit, regardless of the ordinary or the technical meaning of the words 'throttling-valve,' we will unhesitatingly accept another definition if ascertainable from the patent.").

Sometimes it may be difficult to determine whether a patentee has served as a lexicographer. Not here. As an initial matter, the term "molecular cluster" is set off by quotation marks, indicating an intent to define the term. *See Sinorgchem Co. v. ITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) (finding

lexicography where "[t]he term 'controlled amount' is set off by quotation marks--often a strong indication that what follows is a definition."); *see also SEVEN Networks, LLC v. Apple Inc.*, No. 2:19-CV-115-JRG 2020 U.S. Dist. LEXIS 55476, at *114-16 (E.D. Tex. Mar. 31, 2020) ("the quotation marks around 'activity session' reinforce the clarity of the lexicography"). Here the patentee also prefaces the definitions by stating that the ensuing language is how the term "should be understood herein." This classic definitional phrasing indicates a clear intent by the patentee to define the term. *See Chemtall, Inc. v. United States*, 878 F.3d 1012, 1023 (Fed. Cir. 2017) ("It is well recognized that a patentee may set out a definition of a term and act as his own lexicographer…The '760 patent and Dr. Storey's patent do so explicitly, beginning the definition of 'amide' with the phrase '[a]s used herein.'"). Indeed, to the extent there are multiple plausible meanings, the patents explain that they provide an express definition "for the sake of clarity." '828 patent at 3:29-30; '423 patent at 5:5; '365 patent at 5:21.

In its effort to invalidate the patents as indefinite, Samsung asks the Court to ignore the patents' express definitions and look instead toward expert testimony and contrasting dictionary definitions. Samsung's patchwork of extrinsic evidence "is unnecessary, and ***indeed improper***, when the disputed terms can be understood from a careful reading of the public record. Nor may it be used to vary claim terms from how they are defined, even implicitly, in the specification or file history." *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1578 (Fed. Cir. 1996) (*citing Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1547 (Fed. Cir. 1994) (emphasis added)). Thus, Samsung's expert testimony has no role here. *See id.* at 1584 ("[W]here the patent documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to no weight.") (citing *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1999). Nor can Samsung's dictionary definitions be used to contradict the patents' express definitions. *Id.* at 1584 (dictionaries only allowed "so long as the

dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents").

Even if expert testimony was appropriate here, which it is not, Samsung's expert is unpersuasive. He purports to find a "lack of reasonable certainty as to the meaning and scope" of the term "molecular cluster compound" because it is defined slightly differently across the patents. *See e.g.,* Declaration of Peter J. Cuomo ("Cuomo Decl.") at Ex. A (Declaration of Dr. Brian Korgel ("Korgel Decl.") (served by Defendants)), ¶ 53. However, patentees are free to define the same term differently in different patents. *US Foam, Inc. v. On Site Gas Sys.*, 735 F. Supp. 2d 535, 546 (E.D. Tex. 2010) ("By defining 'extinguish' in the '336 patent, the patentee chose to give the continuation-in-part a narrower scope than its parent. This is a rare case where the same claim term in two related patents does not share the same meaning."); *see also Uniloc USA, Inc. v. Autodesk, Inc.*, No. 2:15-cv-1187-JRG-RSP, 2016 U.S. Dist. LEXIS 87921, at *30-34 (E.D. Tex. July 7, 2016) ("The Court discerns a meaningful difference between the '523 Patent's definition and the '820 Patent's definition . . . . While terms should be construed consistently across patents in a family when possible, the inventor's lexicography governs."). The law is clear. If the patentee defines a term, the term is given that definition. *See Phillips*, 415 F.3d at 1316 ("the inventor's lexicography governs").

Additionally, the difference between the definitions in the various patents would not be confusing to a POSITA. There are elements which are not strictly classified as metals, but nonetheless act like metals chemically. Cossairt Decl., ¶¶ 52-53. A chemist would understand that the phrase "and non-metals" as used in the '423 and '365 patents refers to these types of elements. *Id*. This is because the definition identifies "atoms and their associated ligands," and an atom with a "ligand" is behaving like a metal atom. *Id*. Likewise, there is little difference between the terms molecular mass and molecular formula. Cossairt Decl., ¶ 51. They are used interchangeably in the art. *Id.*

The '557 patent does not expressly define the term "molecular cluster compound." However, as Samsung's expert agrees, a POSITA would construe the claims of the '557 patent consistently with the other asserted patents given "the relationship between the patents, their recitation of similar technology and identical reliance on the use of 'molecular cluster compounds,' and their use of identical or substantially similar terms and descriptions in their specifications." Korgel Decl., ¶ 46. Whether the term "molecular cluster compound" in the '557 patent is construed consistent with the '828 patent's definition (as Nanoco proposes), or consistent with the '434 and '365 patents' definition, does not meaningfully alter the scope of the claims or have any impact in this case. As Dr. Cossairt explains, the difference between metal and non-metal in the context of the patents is a distinction without a difference. *See* Cossairt Decl., ¶ 52 ("While the '828 Patent's definition is potentially narrower by excluding non-metals, this narrowing is not scientifically meaningful. A POSITA would understand that, when the '423 and '365 patents recite that a molecular cluster compound can include 'metal or non-metal atoms,' the patent owner meant that a molecular cluster compound could contain atoms that some scientists do not consider to be true metals, but that can behave as metals in certain circumstances...").

### 2. The term "molecular cluster compound" is not indefinite

A patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as the invention." 35 U.S.C. § 112 ¶ 2 (pre-AIA). "A claim fails to satisfy this statutory requirement and is thus invalid for indefiniteness if its language, when read in light of the specification and the prosecution history, 'fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention.'" *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1369-70 (Fed. Cir. 2014) (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901, 134 S. Ct. 2120, 189 L. Ed. 2d 37 (2014)). "Reasonable certainty" does not require "absolute or mathematical precision." *Biosig Instruments, Inc. v. Nautilus,*

*Inc.*, 783 F.3d 1374, 1381 (Fed. Cir. 2015) (internal quotation marks omitted). Rather, "[a]s long as claim terms satisfy [the Nautilus] test, relative terms and words of degree do not render patent claims invalid." *One-E-Way, Inc. v. Int'l Trade Comm'n*, 859 F.3d 1059, 1063 (Fed. Cir. 2017).

Samsung's principal indefiniteness argument appears to be that the term "molecular cluster compound" did not have a single widely understood meaning in the art. Korgel Decl., ¶¶ 50-52. This argument fails because, as discussed above, "molecular cluster compound" should be construed exactly as the patentee defined it in the patents. Any competing dictionary definitions or expert testimony must be disregarded if they are inconsistent with the definitions in the patents. *Vitronics*, 90 F.3d at 1584. Samsung's secondary indefiniteness arguments appear to be directed at the definitions presented in the patents. Korgel Decl., ¶¶ 58-59. These arguments fail as well.

First, Samsung's expert contends that a POSITA could not tell whether the disclosed molecular cluster compounds are limited to compounds with three or more metal atoms, or if they encompass any compound with three or more atoms, whether metal or nonmetal. Korgel Decl., ¶ 58. This argument is necessarily limited to the '423 and '365 patents, which are the only patents that include "nonmetal" atoms in the definition. As discussed above, a POSITA would not be confused by this definition. Because the definition refers to nonmetal atoms "***and their associated ligands***" a POSITA would understand that the patentee meant that the molecular cluster compound could contain atoms that some scientists may not consider to be true metals, but that can behave as metals in certain circumstances. Cossairt Decl., ¶¶ 52-53. Moreover, the use of "or" in "metal or nonmetal" shows that "clusters of 3 or more metal atoms" and "clusters of 3 or more nonmetal atoms" are distinct alternatives to each other, not to be combined. *See Wasica Fin. GmbH v. Cont'l Auto Sys., Inc.*, 853 F.3d 1272, 1280 (Fed. Cir. 2017) (stating that the Federal Circuit generally interprets the use of the word "or" in a patent as designating "distinct alternatives"); *see also Van Wersch v. Dep't of Health & Human Servs.*, 197 F.3d 1144, 1148 (Fed. Cir. 1999) ("[t]he plain meaning of 'or' is

disjunctive… . There simply is no way around the fact that, in the English language, the word 'or' unambiguously signifies alternatives.") (citing Webster's Third New International Dictionary 1585 (1986)). Samsung's expert is wrong to suggest a conjunctive meaning that "clusters of 3 or more metal or nonmetal atoms" could be "clusters of three or more atoms whether metal or nonmetal." Korgel Decl., ¶ 58. Samsung's expert also ignores the specification, which not only lists countless molecular cluster compounds by their chemical formula ('423 patent at 11:33-12:38), but also includes figures with diagrams of molecular cluster compounds. '423 patent at Fig. 2. Each example shows three or more of the *same* metal atom forming the molecular cluster compound. This context provides any needed clarity. The use of "metal or nonmetal" does not render the '423 or '365 patents indefinite.

Second, and related only to the '828 and '557 patents, Samsung's expert contends that "approximately the same relative molecular formula" is indefinite by suggesting that a "POSITA would not have understood whether $H_2O$ (water) has 'approximately' the same relative molecular formula as $H_2O_2$ (peroxide)." Korgel Decl, ¶ 60. This is a false comparison and the kind of argument only a lawyer could love. Peroxide not only doubles the ratio of oxygen atoms to hydrogen atoms— a hugely significant change in the ratio of elements in the molecule—but more tellingly, it creates a completely different chemical compound with completely different chemical properties, as Samsung's expert admits. *Id*. (noting different chemical characteristics of water and peroxide). A suggestion that any POSITA would think $H_2O$ and $H_2O_2$ are "approximately the same" molecular formula strains credulity. It is clear what the '828 patent is claiming—clusters of *substantially identical* molecules clustering together. *See* '828 patent at 11:27-28 ("[t]he molecular clusters may be formed of a plurality of substantially identical molecules"); *id*. at 6:38-40 ("nanoparticles are produced using molecular clusters, which may be collections of identical molecules…"). Because the claims inform with reasonable certainty the scope of the invention, they satisfy the *Nautilus*

standard. And "[a]s long as claim terms satisfy [the Nautilus] test" the use of "approximately" within the definitions does not render the patent claims indefinite. *One-E-Way, Inc.*, 859 F.3d at 1063.

**B.    "wherein said[/the] conversion is[/being] effected in the presence of a[/the] molecular cluster compound" ('423, '365, '828, and '557 patents)**

| Nanoco's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| No construction is needed. This claim term should receive its plain and ordinary meaning. | "a molecular cluster compound acts as a seed or template to grow the nanoparticle core" |

The claim term "wherein said[/the] conversion is[/being] effected in the presence of a[/the] molecular cluster compound" is clear and requires no construction. The term "molecular cluster compound" is being independently construed (*see* § IV.A, *supra*), and the remainder of the term is a collection of common English words with well-understood meanings not only to a POSITA, but also to a lay person. The term should be accorded its plain and ordinary meaning, namely, that the claimed nanoparticle is made by conversion of nanoparticle precursors *in the presence of* a molecular cluster compound. *See O2 Micro*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) (holding that a court need not construe a claim if it is understandable to a layperson and adopting the plain and ordinary meaning would resolve the dispute). Samsung attempts to import additional limitations and restrict the scope of this limitation such that the "molecular cluster compound *acts as a seed or template to grow the nanoparticle core*." But the claim term does not require this additional language.

The claim language is clear. It requires only that the molecular cluster compound be "presen[t]" while the precursors are converted. Nothing in the claim language requires that the "conversion" be "effected" in any particular way. Here Samsung ignores the plain language of the claim and instead relies on the specifications in an attempt to limit the scope of the claim language. As the Federal Circuit has repeatedly explained, such importation of limitations into a claim is wholly improper absent special circumstances, none of which exist here. *See Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1218 (Fed. Cir. 2014) (quoting *Phillips*, 415 F.3d at 1323).

Samsung tries to insert language from one of a number of embodiment discussed in the specification while ignoring language within that very embodiment meant to make clear that the invention is not to be limited to that embodiment. The patentee specifically and expressly stated a desire *not* to be "bound by" a proposed theory in which the molecular cluster compound "acts as a seed or nucleation point upon which nanoparticle growth can be initiated." *See, e.g.*, '423 patent at 4:61-66 ("Without wishing to be bound by any particular theory, one possible mechanism by which nanoparticle growth may take place is that each identical molecule of the cluster compound acts as a seed or nucleation point upon which nanoparticle growth can be initiated."); '365 patent at 5:9-14 (same).

Further, in accordance with the teaching that seeding is only one possible mechanism, the patentee discusses other potential mechanisms for how the molecular cluster compound might be involved in the formation of the claimed nanoparticles without the molecular cluster compound acting as a seed. For example, the specifications teach that the molecular cluster compound may merely "facilitate" the seeding process. *See* '828 patent at 6:42-45 ("Molecular clusters can either have the same elements as required in the nanoparticles to be formed, or other elements, *as long as they can facilitate a seeding reaction*." (emphasis added)); *id.* at 11:32-35 ("[T]he molecular clusters *facilitate* the nucleation and growth of nanoparticles that may otherwise be quite difficult to fabricate in the absence of the molecular clusters." (emphasis added)). As the patentee acknowledges in the specification, a POSITA would recognize that the molecular cluster compound could facilitate nanoparticle formation without strictly serving as a seed or template. *See* Cossairt Decl., ¶¶ 56-59. Because nothing in the specification requires "conversion" to be "effected" in any particular way, Samsung is incorrect to try and limit the meaning of molecular cluster compound to one that can only "*act as a seed or template to grow* the nanoparticle core." Thus, the specification supports the plain meaning of the term.

Samsung's reliance on the prosecution history also falls short. Samsung emphasizes that the patentee stated that "the structure of the molecular cluster remains intact during nanoparticle seeding and growth" and described the invention of the '423 patent as a "seeding method." Korgel Decl., ¶¶ 81-82. Neither of these statements require the molecular cluster to serve exclusively as the seed. The first statement requires only that the molecular cluster compound remain intact during seeding and growth (i.e., not dissolve). And referring to the '423 patent as a "seeding method" does not require the molecular cluster to be the seed. Of course the patent is a "seeding method." Every claim in the patent requires the method to performed "under conditions permitting seeding and growth of the nanoparticle." '423 patent at 20: 7-9; *id.* at 22:17-19. Nothing, however, requires that the molecular cluster to be the seed of the growing nanoparticle.

Further, the doctrine of claim differentiation counsels against a construction incorporating Samsung's additional language. Under that doctrine, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315. Here claim 1 requires that "conversion is effected in the presence of a molecular cluster compound…under conditions permitting *seeding and growth of the nanoparticle*," while dependent claim 4 requires "[conversion is effected in the presence of a molecular cluster compound…] under conditions permitting *seeding and growth of the nanoparticle on the molecular clusters* of said compound.". *Compare* '423 patent at 20:5-9 with *id.* at 20:22-24 (emphasis added). With dependent claim 4 already limited to embodiments where the molecular cluster compound acts as a seed or template, claim 1 is presumed to be broader. *See Liebel-Flarsheim Company v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("As this court has frequently stated, the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim."). Samsung offers no reason to incorporate dependent claim 4's limitation into independent claim 1.

In sum, Samsung's proposed construction should be rejected. The term is clear and requires no construction.

### C.    "first semiconductor material" ('557 patent)

| Nanoco's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| No construction is needed. This claim term should receive its plain and ordinary meaning. | "a material having a narrower band gap than the core and second semiconductor material" |

The meaning of the claim term "first semiconductor material" is clear and does not require construction. The patentee used the term "first semiconductor material" in the '557 patent in accordance with its plain and ordinary meaning. It is a simple collection of words that is understood not only to a POSITA, but also to a lay person. The '557 patent does not define or give any special meaning to the term, which indicates that the patentee deemed it unnecessary to do so.

Samsung seeks to limit "first semiconductor material" to "*a material having a narrower band gap than the core and second semiconductor material*." That definition is unduly limiting and unsupported by the intrinsic evidence. First, and perhaps most tellingly, the '557 patent does not claim any "band gap" or other properties of the "first semiconductor material," let alone require that the "first semiconductor material" have a "narrower band gap" than the "core" and "second semiconductor material." *See* '557 patent at 3:24-43, 5:4-31; Cossairt Decl., ¶ 61. The patent merely requires the use of a semiconductor material. There is no reference to a "band gap" measurement being required to choose this first semiconductor material.

Second, Samsung's construction excludes embodiments disclosed by the specification from every claim. A construction that excludes embodiments is "rarely correct." *Optis Wireless Tech., LLC v. Huawei Device Co.*, No. 2:17-cv-123-JRG-RSP, 2018 U.S. Dist. LEXIS 7711, at *35 (E.D. Tex. Jan. 18, 2018) (citing *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013)). Specifically, the '557 patent discloses embodiments in which the first semiconductor

material has a *wider* band gap than the core and second semiconductor material. For example, the patent discloses that some examples of first semiconductor materials may include a "Group II Source (e.g. Mg)" from the periodic table. '557 patent at 21:47-57. A POSITA at the time of the invention would have understood that Mg (magnesium)-containing semiconductor materials have an exceptionally wide band gap, and thus that any embodiment in which magnesium were used as a "first semiconductor material" would almost certainly have a *wider*, not a narrower, band gap than the core and second semiconductor material. *See* Cossairt Decl., ¶ 61. Where "claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment." *Mars, Inc. v. TruRX LLC*, No. 6:13-CV-526, 2015 U.S. Dist. LEXIS 187875, at *16-17 (E.D. Tex. Aug. 6, 2015 (quoting *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008)). That is particularly true here where the patentee makes no reference whatsoever to band gap to inform the choice of a first semiconductor material.

Samsung's attempt to limit the "first semiconductor material" to those "having a narrower band gap than the core and second semiconductor material" is also unavailing because it restricts the '557 patent claims to embodiments with "quantum dot-quantum well (QDQW) structures."[1] While the specification does describe QDQW and other quantum dot structures, the claims themselves are not so limited. *See* '557 patent at 30:64-31:17. Furthermore, the specification expressly states that for QDQW particles, the layer of "material used on any shell or subsequent numbers of shells grown on to the core . . . in most cases will have a wider band-gap than the core material," not a narrower band-gap as Samsung's construction would require. *Id.* at 18:31-42. Thus, not only does the '557 patent not require adding Samsung's proposed limitations, it teaches the opposite in several places.

---

[1] It appears Samsung plans to argue that "the first layer (shell)/first semiconductor material must have a narrower band gap relative to the core and second layer(shell)/second semiconductor material." Korgel Decl., ¶ 90.

In sum, because the patentee here has not "demonstrated a clear intention to limit the claim scope," even if the '557 patent embodiments had only depicted first semiconductor materials having narrower band gaps than the core and second semiconductor materials (which they do not), the term "will not be read restrictively." *Arlington Indus.*, 632 F.3d at 1254.

### D.   "emulsion" ('068 patent)

| Nanoco's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| No construction is needed. This claim term should receive its plain and ordinary meaning.<br><br>If the Court determines to construe this term, the plain meaning is: "a mixture of two or more immiscible liquids, in which one liquid is dispersed in another liquid." | "a suspension of two or more immiscible liquid phases, in which one liquid phase is dispersed in another liquid phase" |

The term "emulsion" in the '068 patent requires no construction because the patentee used the term in accordance with its plain and ordinary meaning. The plain meaning of "emulsion" is "a mixture of immiscible liquids, in which one liquid is dispersed in another liquid." *See* Declaration Of Dr. Stephen G. Weber, Ph. D. In Support of Plaintiff Nanoco Technologies Ltd.'s Claim Construction Brief ("Weber Decl.") (Ex. 7) ¶ 57. Notably, another district court has already found that this is the plain meaning of the term. *See Arbmetrics, LLC v. Dexcom, Inc.,* Case No.: 18-CV-134 JLS (KSC), 2019 U.S. Dist. LEXIS 222306, *12-14 (S.D. Cal. Dec. 30, 2019) (construing emulsion in accordance with its ordinary and customary meaning as "a mixture of two or more immiscible liquids, in which one liquid is dispersed in another liquid."). This is how the term "emulsion" is used in the '068 patent. '068 patent, 1:17-23 (disclosing a solution of suspended QDs being added to a second solution to yield an emulsion). Nanoco's construction adopts this plain meaning. On the contrary, Samsung proposes that the term "emulsion" should be given a special

definition that imports limitations from the specification and surrounding claim language. This is wholly improper absent special circumstances, none of which exist here. *Phillips,* F.3d 1303 at 1323.

Samsung's construction is correct to the extent that it requires a dispersion of two or more immiscible liquids (liquids that do not fully dissolve into each other, but instead separate like oil in water). However, the remainder of Samsung's construction only adds confusion by including the words "suspension" and "phase." The word "suspension" causes confusion because it traditionally refers to ***solids*** dispersed in liquids, not liquids dispersed in liquids. Weber Decl., ¶ 66. The only use of the word "suspension" in the '068 patent describes a suspension of solid quantum dots in a liquid, and is thus in accord with this traditional meaning. *See* '068 patent at 2:18-21 ("According to some embodiments, QDs are suspended in a solution of a first polymer resin (i.e., a QD-compatible resin). ***The QD suspension*** is then added to a solution of the second polymer resin.").[2] Thus, because "suspensions" traditionally refer to mixtures of solids in liquids, and because the patentee used the term according to that meaning, it should not be read into the definition of emulsion, and can only cause confusion.

Nanoco's definition of emulsion as meaning "a ***mixture*** of two or more immiscible liquids" is more accurate and less confusing. It also comports with the '068 patent's specification, which repeatedly refers to an emulsion as a mixture. For example:

- According to some embodiments, the phase 1-phase 2 ***mixture*** forms an emulsion ….

- Example 1B - Two-phase resin was prepared by ***mixing*** 148 microliters of the phase 1 resin with 0.5 mL degassed epoxy (Epotek, OG142) and the ***mixture*** was mechanically stirred for 3 min at 100 rpm under nitrogen.

---

[2] The specification does state that one liquid can be suspended in another, but does not refer to such a mixture as a "suspension."

- Example 2 - Two-phase resin was prepared by ***mixing*** 148 microliters of the phase 1 resin with 0.5 mL degassed polyurethane acrylate (Dymax OP4-4-26032) and the ***mixture*** was mechanically stirred for 3 min at 100 rpm under nitrogen.

'068 patent at 6:16-42. Samsung's expert's own exhibits support Nanoco's definition. *See e.g.,* Cuomo Decl. Ex. D (attaching Korgel Decl., Ex. 42) (defining an "emulsion" as "[a] stable ***mixture*** of two or more immiscible liquids held in suspension by small percentages of substances called emulsifiers."); *id.*, Ex. E (attaching Korgel Decl., Ex. 43) (explaining that "[b]y making an emulsion, one can ***mix*** two liquids that ordinarily do not ***mix*** well, such as oil and water."); *id.*, Ex. F (attaching Korgel Decl., Ex. 48) (defining emulsion as "a suspension of one liquid such as oil in another such as water," and defining "emulsify" as "to ***mix*** two liquids so thoroughly that they will not separate," and "emulsifier" as "a substance added to ***mixtures*** of food such as water and oil to hold them together.") (emphases added to each).

Samsung is also incorrect to import the word "phase" into its construction. The patent uses the word "phase" to keep track of which liquid resin is being discussed. *See e.g.,* '068 patent at 4:42-45 ("Multi-phase films utilizing at least a first phase (phase 1) resin that is compatible with the QD material and at least a second phase (phase 2) resin that is efficient at rejecting O2 are described herein."). Throughout the patent, the word "phase" is always used to identify a liquid resin by number. *See e.g., id.* at 5:26-50 ("The QD-***phase 1 resin*** dispersion can then be mixed with a solution of the ***phase 2 resin*** (or resin monomer) 402. As explained above, the ***phase 2 resin*** is a better oxygen barrier than the ***phase 1 resin***. The ***phase 2 resin*** is generally a hydrophilic resin. The ***phase 2 resin*** may or may not be cross-linkable. The ***phase 2 resin*** may be a curable resin…."). The claim also uses "phase" in this same way:

> 1. A method of preparing a film, the method comprising: forming an emulsion comprising a ***first phase*** that comprises a first polymer and quantum dots and a ***second phase*** that comprises a second polymer; depositing the emulsion between gas barrier sheets to form a film; and curing the first and second polymers.

'068 patent at 8:54-61. Samsung's construction uses the term "phase" in a manner divorced from this resin-numbering vernacular. Samsung contends that emulsion means "… one liquid phase is dispersed in another liquid phase." In this way Samsung's construction becomes incredibly confusing to a juror, who will understand that the "liquid phase" is one of the three fundamental "phases" of matter (the others being the solid phase and gas phase). Putting "liquid phase" into the claim can only cause confusion.

Because the word "phase" is already used by the claims to identify the two different resins, Samsung's construction would add three more recitations of the word and introduce redundant language while rendering other parts of the claim meaningless. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("[I]nterpretations that render some portion of the claim language superfluous are disfavored."). *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."). The confusion caused by this redundancy can be seen when Samsung's proposed construction for "emulsion" is applied to claim 1:

> 1. A method of preparing a film, the method comprising: forming a [*suspension of two or more immiscible liquid phases, in which one liquid phase is dispersed in another liquid phase*] comprising a first phase that comprises a first polymer and quantum dots and a second phase that comprises a second polymer; depositing the [*suspension of two or more immiscible liquid phases, in which one liquid phase is dispersed in another liquid phase*] between gas barrier sheets to form a film; and curing the first and second polymers.

Since the patentee chose to use to use the term "phase" in the claims to refer to resins, it shows the patentee did not mean to define emulsion to include "phase." Instead, it is clear by the surrounding claim language that the term "emulsion" is being used in accordance with its ordinary meaning. If any construction at all is to be applied to this term it should be the ordinary meaning of "a mixture of two or more immiscible liquids, in which one liquid is dispersed in another liquid."

E.    **"polymer" ('068 patent)**

| Nanoco's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| "A polymerized or polymerizable substance." | Plain and ordinary meaning, i.e., "a molecule composed of repeating subunits" |

A POSITA reading the '068 patent would see the expansive use of the word "polymer" throughout the specification and conclude that the patentee did not mean to give the term a narrow formalistic definition, but rather used it repeatedly and consistently to include both "polymerizable" substances (substances that readily produce formal polymers) and "polymerized" substances (formal polymers). Nanoco's proposed construction comports with the examples in the specification and the specification's consistent use of the term. In contrast, Samsung's proposed construction would read out every single example disclosed in the patent. Such a construction is "rarely, if ever, correct." *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007).

The '068 patent relates to quantum dot films for use in televisions and other displays. The specification has five examples that teach how to make these films by using liquid resins that are polymerized into solid films. ***All*** of the examples use a liquid resin (called a phase 1 resin) made of a chemical called lauryl methacrylate (LMA). LMA is a polymerizable substance. That is, it is a substance that will form a polymer upon certain conditions, but it is not a polymer in the formal sense of that term. When you order LMA from a chemical catalog, as Dr. Weber explains, you get LMA as an ***unpolymerized*** monomer resin. Weber Decl., ¶73. The lack of any repeating structural unit in

liquid LMA is evident from the molecular formula provided by any chemical catalog, such as Sigma-Aldrich, which shows LMA as a single molecule with no repeating subunits:

*Id*.; *see also* NANOCO_0058842. LMA is further described in technical documents as "…***monofunctional monomer*** with a characteristic high reactivity..." *See* NANOCO_00058843-844 (Jamorin) and NANOCO_00058884-886 (BASF) (emphasis added). A POSITA would order LMA for one essential purpose: to form the polymer (a ***poly***methacrylate). The patent describes adding quantum dots to LMA and then causing the LMA to polymerize. So in the context of the patent, when the claim refers to a "polymer," it is understood that these types of monomers that polymerize (like LMA) are included.

In fact, in ***every one*** of the '068 patent's examples, quantum dots are dispersed in a phase 1 resin of the polymerizable monomer, LMA. *See* '068 patent at 6:1-8 (Example 1A) ("[T]he resultant solid QD [was] re-dispersed in degassed lauryl methacrylate…."); *id* at 6:34-41 (Example 2) (disclosing a two-phase resin prepared by mixing the phase 1 resin from Example 1A); *id*. at 6:56-64 (Example 3) ("The QDs were re-dispersed in degassed lauryl methacrylate…."); *id*. at 7:9-23 (Example 4) ("The QDs were re-dispersed in degassed lauryl methacrylate…."); *id*. at 7:31-29 (Example 5) ("…green QDs in a single-phase resin, as prepared in Example 1a above"); *see also* Weber Decl., ¶ 72. These examples also directly track the claim language by disclosing a "phase 1 resin" made up of "QDs" "dispersed" or "re-dispersed" in "lauryl methacrylate" (LMA). *See id*. at 8:54-61 (claim 1) ("***a first phase*** that comprises a ***first polymer*** [e.g., LMA] and **quantum dots**") (emphasis added).

If, as Samsung proposes, the claim term "first phase that comprises a first *polymer* and quantum dots" is to be read to include only substances that are already polymerized (i.e., formal polymers), then each and every example of the patent is read out of the claim, because each and every example describes LMA as the "first phase." Countless cases tell a court not to construe a claim in this way. *See*, *e.g.*, *Kaneka v. Xiamen Kingdomway Group*, 790 F.3d 1298, 1304 (Fed. Cir. 2015) ("A construction that excludes all disclosed embodiments ... is especially disfavored."); *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification …. [W]here claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment."); *MBO Labs*, 474 F.3d at 1333.

The '068 patent also discloses other polymerizable monomeric compounds such as vegetable oil, fatty acids and fatty acid esters, which are all cited as examples of suitable "phase 1 resins." *See e.g.,* '068 patent at 4:59-5:12. As Dr. Weber explains, "[e]ach of these compounds are traditionally thought of as monomers (i.e., polymerizable substances) but are referenced and contemplated in the '068 patent as examples of polymer resins," or the "'resin monomer[s],' which are specifically called out." Weber Decl. ¶78. The '068 patent further discloses "phase resins," "polymer materials," "polymer resins," and "resin monomers" and uses these terms interchangeably, for example:

- "FIG. 4 is a flowchart illustrating steps of a method of preparing multi-phase films as described herein. The QDs are dispersed in a solution of the *phase 1 resin (or resin monomer)* 401."

- "In addition to the QDs and *phase 1 resin (or resin monomer)*, the solution of 401 may further include one or more of a photoinitiator, a cross-linking agent, a polymerization catalyst…."

- "The QD-phase 1 resin dispersion can then be mixed with a solution of the *phase 2 resin (or resin monomer)* 402."

'068 patent at 4:59-62, 5:15-20, 5:26-29 (emphasis added to each); Weber Decl. ¶ 75. In sum, Dr. Weber explains, "[t]he patented method claimed by the '068 patent is not strictly limited to 'polymers' already made up of repeating monomeric or polymeric subunits, but rather contemplates and includes additional materials, including materials that require polymerization and curing as a part of the final claimed method step." *Id*. ¶71.

The specification of a patent can act as a dictionary not only when it expressly defines terms used in the claims, but also "when it defines terms by implication." *Vitronics Corp.,* 90 F.3d at 1582; *see also Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001) (holding that "a claim term may be clearly redefined without an explicit statement of redefinition," because "the specification may define claim terms 'by implication' such that the meaning may be found in or ascertained by a reading of the patent documents"). That is exactly the case here. Nanoco's proposed construction of the claim term "polymer" as "a polymerized or polymerizable substance" aligns with the claim language and remains faithful to the specification and every single example of the '068 patent. *Bell Atl. Network*, 262 F.3d at 1271 ("[W]e have specifically held that the written description of the preferred embodiments 'can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format.'") (citing *Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001)).

## V.      CONCLUSION

For the foregoing reasons, Nanoco respectfully requests that the Judge adopt Nanoco's proposed constructions.

Dated: February 12, 2021

Respectfully submitted,

s/ *Michael Newman w/ permission Claire Henry*

Michael Newman
Massachusetts BBO No. 667520
MCNewman@mintz.com
James Wodarski
Massachusetts BBO No. 627036
JWodarski@mintz.com
Michael T. Renaud
Massachusetts BBO No. 629783
MTRenaud@mintz.com
Thomas H. Wintner
Massachusetts BBO No. 667329
TWintner@mintz.com
Peter J. Cuomo
Massachusetts BBO No. 661368
PJCuomo@mintz.com
Matthew Galica
Massachusetts BBO No. 696916
MSGalica@mintz.com
MINTZ LEVIN COHN FERRIS
   GLOVSKY AND POPEO PC
One Financial Center
Boston, MA 02111
Tel: (617) 542-6000
Fax: (617) 542-2241
www.mintz.com

T. John Ward, Jr.
Texas State Bar No. 00794818
E-mail: jw@wsfirm.com
Claire Abernathy Henry
Texas State Bar No. 24053063
E-mail: claire@wsfirm.com
WARD, SMITH & HILL, PLLC
PO Box 1231
Longview, Texas 75606-1231
(903) 757-6400 (telephone)
(903) 757-2323 (facsimile

*Counsel for Plaintiff Nanoco Technologies Ltd.*

PLAINTIFF NANOCO TECHNOLOGIES LTD.'S INITIAL CLAIM CONSTRUCTION BRIEF

26

## CERTIFICATE OF SERVICE

I certify that on February 12, 2021, I caused a true and correct copy of the foregoing to be served via ECF on all counsel of record.

/s/ *Claire Henry*
Claire Henry